United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States Dishonorable Court. Thank you. Welcome to the advocates on this case. For the record, I will say this is Lexon Insurance Company v. Chevron, et al., Clause No. 2420347, special Zoom argument. I hope this accommodation has worked out for everyone. It is fine with the court in special circumstances like this. So let us begin. Appellant, you, I don't have it in front of me how much time you say before we vote, but let's hear your opening argument. Thank you, Your Honor. Brian Ginsberg for Lexon. I reserve five minutes for rebuttal. May it please the court. The district court's decision rests on a misunderstanding of suretyship law that eliminates a critical right that sureties and industries that depend upon sureties have relied upon for centuries, subrogation against third parties. Under federal or Louisiana law, as a paying surety, Lexon acquired the right to recoup its bond payment from any party that the government was entitled to pursue once the decommissioning deadline passed without performance. That includes the corporate defendants who under DOI regs were jointly and severally liable with lender for the decommissioning obligations. Under the established federal common law of equitable subrogation, subrogation is authorized as against third parties. And contrary to the argument of my friends on the other side, that doctrine does apply on the OCS. Federal common law in the first instance is part of the laws of the United States that OCSLA extends to the OCS. And the federal common law of equitable subrogation is not one of the three particular areas of federal common law that either the Supreme Court or this court has found a specific legislative intent to exclude from that applicability, namely the creation. You certainly rely on federal common law. To some extent, you have more arguments that does strike me as odd if it's so important why the relatively recent Parker opinion by Justice Thomas and many of our opinions never referred to federal common law as the gap filler. And it does seem to me almost like the opposite applies, that we're not we don't are we're not supposed to be creating federal common law in this area. Help me with that. You are certainly not supposed to be creating new federal common law. That's the admonition that the U.S. Supreme Court said in the Chevron case in 1971. But the doctrine of established federal common law, the established federal common law of equitable subrogation is just that well established. In fact, as the U.S. Supreme Court said back in the Perlman case, quote, Probably there are few doctrines better established than that assurity who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. What precedent do you have, Mr. Ginsburg, that applies federal common law post Oxlow, if I'm pronouncing the acronym correctly, and saying that that's a gap filler, despite the language of the statute saying look to state law. I don't have a case that applies federal common law, Your Honor, because all of the cases that have come before the Supreme Court and before this court have been found to fall into one of these three narrow exclusionary areas of federal common law, namely the creation of new federal common law, common law from admiralty doctrines or common law remedies and defenses associated with state law, substantive causes of action. But that's not the case here at all. There is no legislative intent to exclude established federal common law as opposed to new outside of admiralty, as opposed to within it that creates its own substantive cause of action, as opposed to that piggybacks on a state substantive cause of action. But even if the federal common established federal common law doesn't apply as such, it still animates Section 9309 sub two, which is also on point and also allows subrogation against third parties to start with a broad text of that statute under which a paying surety can bring, quote, a civil action under the bond to recover amounts paid under the bond. Close, quote, full stop without any further limitation. There is no language limiting actions to actions against the principle and there's no cross-reference or statutory reference limiting actions to enforcement of the asset priority given in 9309 sub one. And again, that breadth is would be significant on its own, but it's doubly significant here insofar as it signals a legislative intent to incorporate as opposed to displace the greater than 150 year history of equitable subrogation against third parties that led up to 9309 enactment. So what counsel, if that's the case, and what do we do with the language under the bond after civil action, civil action under the bond? What we do with that language is fully embrace it because Lexon's claim fits within it. Lexon's claim here for the for subrogation is under the bond because it is now quoting from the US Supreme Court in the Ardestani case where it gave a definition of the word under is, quote, subject to pursuant to or by reason of the authority of the bonds. And we know that because Lexon's claim arose when and because the bonds were paid. That is the event that made Lexon a paying surety, which gave rise to to Lexon's claim. So at the very least, the claim is pursuant to the bonds. It arises directly out of the bonds and the bonding, the tripartite surety ship relationship. But even if the court is thinking about Louisiana law here as opposed to federal law, and we do think because federal law applies and provides the requisite right that it governs, Louisiana Civil Code Article 3048 encompasses equitable excuse me, encompasses subrogation against third parties. Also, again, start with the broad text under which a paying surety is, quote, subrogated by operation of law to the rights of the creditor, close quote, without any further limitation, including no language limiting that right to rights against the principle. And that's in marked contrast to neighboring articles of the code regarding the distinct right of reimbursement, again, as distinguished from the right to subrogation that are expressly limited to rights as against the principle, such as Article 3049, which describes the right to reimbursement, and Article 3053, which described the related right to reimbursement security. The corporate defendant's interpretation would create the textual absurdity of collapsing the right of subrogation into that distinct reimbursement right. It would also create a practical absurdity here because often surety ship, like in this case, is only meaningful as against third parties because often the surety is only called upon to pay precisely because the principle becomes insolvent. And our interpretation is further of the Louisiana code is further supported by reading the code consistent with the restatement. And I think the clearest provision on that is twenty seven sub one under which a paying surety quote is subrogated to all rights of the obligee with respect to the underlying obligation. That's all rights. So we're very happy to read the code consistent with the restatement. Just to pause for a second and sort of zoom out a bit. I think what where the district court ran afoul here is because it approached all of this analysis, the analysis of the scope of subrogation, whether under federal law or under Louisiana law, with a presumption that there's some sort of anomaly in allowing Lexon as surety to have greater rights than Linder, the principal. And there is no such anomaly here. The rights of the principal are only the yardstick in subrogation via insurance because there the objective is for the insurer to protect the principal, namely the insured. So the paying insurer, when he gets subrogated, stands in the shoes of the principal, the insured. This case is not an insurance case. It's a subrogation case, excuse me, a subrogation case via surety ship, which is a distinct tripartite relationship designed to protect the obligee here, the federal government and taxpayers derivatively. So that means a couple of things. That means that the risk of the surety taking on this arrangement has to be worth the surety's while. So the law allows the paying surety to invoke all rights of the obligee, the party for whose protection the arrangement is designed in order to obtain repayment. And it also means that contractual arrangements that bind the principal, but that do not bind the surety or the obligee, do not limit the paying surety's subrogation rights. So here, to be concrete about it, that means lenders indemnification contract with the corporate defendants has no bearing, which does not bind Lexon, nor does it bind the government, has no bearing on Lexon's rights. So how would you what would you say about Jisker's opinion in trying to try union development? Is he just wrong? Or can you give us a workaround if we think this goes on to something? I'm not sure if there's a workaround, your honor, but I do know looking for one, I'm looking for an answer to what do you make of trial union? Oh, I'm looking for a workaround to your honor. But I think the best and most straightforward response is that try union was wrong because the judges are there respectfully made the same errors that the judge below did here. And I think those errors were animated by the same presumption that seems to have been motivating the court below here, which is approaching this like a case of insurance and measuring outcomes and rights and the like against the yardstick of the rights of the principal as opposed to. Mark, Jisker is dealing with restatement, dealing with sureties, co-sureties and secondary sureties. And it does seem to me that he's making a distinction that on his face has applicability to what we're talking about here, the surety being your client and the other companies now going after the corporate defendants or at best secondary or sub sureties that would come into play if the government could not collect on the bond or whatever else might have happened. So help me with that. Yeah, he does make that characterization, but the restatement seemed to support what he's saying. So regardless of where this goes off base, why isn't that concept correct here? Well, I think that concept is correct if you buy the sub surety, secondary surety relationship. Our point, though, is that this is not a case about secondary sureties, sub sureties or the like, that assuming we're past the scope of subrogation question and we're into what rights did the government have, which is what I take your question to be about. Because Lexan acquired the rights of the government, Lexan had the right to seek payment from the corporate defendants because under DOI regs, the government was entitled to pursue them just as readily as it was entitled to pursue Linder once the decommissioning deadline passed without performance. That's what being joint and severally liable with Linder means. There's no tiered framework. There's no sub sureties. Once that deadline passed without performance, the government could have pursued any jointly and severally liable party in any order. And as a result, Lexan, as a paying surety, can pursue the corporate defendants. And that's fully consistent with the applicable regulations, including 556.710 that the judge below relied upon and that Judge Isker relied upon in his opinion as well. The regs only stated condition is a, quote, failure to perform an obligation under the lease. That occurred prior to subrogation here because prior to subrogation, the decommissioning deadline passed without performance. Now, the reg does not purport to also require the unsuccessful pursuit of the current lessee following non-performance. But for good measure, that also occurred here prior to subrogation. Namely, after the decommissioning deadline passed without performance, the government pursued Linder but came up empty. So in all events, by the time Lexan became a paying surety, any conceivable conditions precedent to pursuit of repayment from the corporate defendants were satisfied. And there's no, nothing tiered or secondary or subsurity about it. Joint and several liability under the regs means that the decommissioning obligations in the first instance were just as much the corporate defendants as they were Linders. It means that non-performance by the deadline for performing those obligations was just as much a default of the corporate defendants as it was a default of Linders. And it means that on the back end, the government was entitled to pursue the corporate defendants just as much and just as readily as it was entitled to pursue Linder. So the question now is Lexan as a paying surety stands in the government shoes and it can do the same thing that the government had the discretion to do. Of course, the government did not do that. It went to Linder first and then it went to Lexan, but because it had the right to go and pursue the corporate defendants first, Lexan upon becoming a paying surety has that same right as well. With the time I have left, I do just want to mention a couple more points about Louisiana law because I understand that there is, at least if one is following tri-union, the temptation to rely upon that. Article 3048, which is the provision of Louisiana law that we rely on, is fully consistent with article 1829 and principally because those provisions serve different functions. Article 1829 enumerates types of persons in whose favor subrogation occurs, but it doesn't speak to the extent or scope of that subrogation in any one instance. Article 3048, by contrast, is a much more substantive provision. It does address the extent or scope of subrogation in the particular context of suretyship, which is the precise context at issue here and again says that the paying surety subrogated by operation of law to the rights of the creditor, period, full stop. But if there's any conflict at all between article 3048 and article 1829, then article 3048, which is again specific to suretyship, the precise context in which subrogation occurs in this case would control. All right, Mr. Ginsburg, your time has expired, so we'll hear from you again. Thank you, your honor. Whoever's the first appellee to proceed, please go ahead. May it please the court, Kelly Becker for Chevron and BP, and I will be speaking this afternoon on behalf of all of the former leaseholders, Chevron, BP, and Sojitz, and Sojitz's counsel will also speak for a few minutes at the end of the appellee's allotted time. This appeal involves a straightforward legal issue where the magistrate judge and the district court both correctly found that based on fundamental principles of suretyship and subrogation, summary judgment should be granted to dismiss the claims of Lexon against Chevron, BP, and Sojitz. The analysis here is straightforward when viewed through the proper hierarchy between principal obligors, sureties for principal obligors, and secondary obligors. This dispute arose when Linder, who was the primary obligor to perform decommissioning work on an offshore federal lease, defaulted on its obligations to the government. As a result, Linder's surety, Lexon, had to forfeit $11 million in bonds to the government to fund the decommissioning work that was ultimately performed by a former leaseholder. Now, despite the fact that Lexon agreed to secure the obligations of Linder, who was the primary obligor, Lexon wants to recover the amounts paid under the bonds from prior leaseholders who weren't parties to the bond and who were only secondary obligors to the government. And that Linder was the primary obligor to the government here is clear. First, under the pertinent regulation, that's 30 CFR 556-710, the government could only call upon the former leaseholders, such as Chevron, BP, and Sojitz, to perform the non-monetary obligation of decommissioning if their assignee failed to perform. This court has interpreted the use of if as imposing a condition. Thus, Chevron, BP, and Sojitz owed a conditional obligation to the government to perform decommissioning if their assignee Linder failed to perform. But let me be clear, the regulation is not the only reason that Linder was the primary obligor here. When Linder purchased the lease from Chevron, as part of the consideration in that sale, Linder contractually agreed to indemnify Chevron and to perform any and all decommissioning work. So under this set of facts, where Lexon agreed to serve as surety for the primary obligor, Lexon, not the secondary obligors, must bear the risk of loss. Indeed, that's the essence of being a surety. There is no principle of law that says a surety must not bear a loss. And Lexon's entire theory of subrogation here, it fails because it brushes past this tiered layer of responsibility, where it was the surety for the primary obligor, which means it has no recourse against secondary obligors. So taking a step back, Lexon suggests it's entitled to subrogation here based on first the federal statute, federal common law, or Louisiana law. But I would submit to the court that Lexon's claim fails under each and every one of those legal theories. First, the federal statute that it points to is 31 U.S.C. 9309 entitled Priority of Sureties. It says that when a person who provides a surety to the government either dies or becomes insolvent, then that surety, one, has the same priority of the government to the assets of the principal and, it's written in the conjunctive, and may bring a civil action under the bond to recover amounts paid under the bond. So Lexon says this is an action under the bond. But the only parties to the bond were Lexon as surety, Linder as the surety's principal, and the government as the creditor. Chevron, VP, and Sojitz are not parties to the bond and no action under the bond can be brought against them. Ultimately, Lexon misreads the statute because it at the second clause of 9309. When the two clauses are read together as they must be, the statute simply provides the surety with the right to bring a lawsuit against the principal where in that lawsuit the surety can assert the government's priority status. The district court correctly found the statute simply has no application. It doesn't speak to a surety's right to subrogation as to a third party. So Lexon alternatively pivots and it goes to federal common law, saying the federal common law gives it a right to subrogation. But as you pointed out, Judge Southwick, federal common law does not apply in cases premised on OXLA jurisdiction. OXLA applies the laws of the United States, which numerous cases, the Rodrigue case, the Fontenot case of the Fifth Circuit, have regulations to the exclusion of federal common law. So when no federal statute is on point, OXLA says you adopt state law as surrogate federal law. What is your response to Mr. Ginsburg's argument in brief that there's established, we're not creating new common law, there's established federal common law on what his claim is asserting? There's federal common law on a surety's right to equitable subrogation. There is no case out of the many cases cited by Lexon in their brief where a surety for a principal obligor was entitled to use equitable subrogation to recover against a secondary obligor. Indeed, the whole principle of equitable subrogation is that the surety is paying the debt for someone who was otherwise primarily responsible. And here, that's the exact point, that the former leaseholders were not primarily responsible. And so even if you were to apply federal common law, you would submit that the result is the same, that even under equitable subrogation, the equities favor Chevron BP and Sojitz here. Ultimately, the district court on the choice of law issue was correct to apply Louisiana law. And it found that under this set of facts, Louisiana law doesn't provide a right to legal subrogation. It looked first to Civil Code Article 3048, which is in a section of the Civil Code entitled effect of suretyship between the surety and the principal obligor. That's critical here. By its very placement in the code, this article is, and this is the article that Lexon hangs its hat on, 3048. This article is limited to Lexon's right against lender, the surety's principal. 3048, what does it say? It says a surety who pays the principal obligation is subrogated by operation of law to the rights of the creditor. But okay, so it's talking about the rights of the creditor here vis-a-vis the principal lender. But it's also talking about, if you read it more broadly, saying it's talking about subrogation by operation of law, it means legal subrogation. And under Louisiana law, legal subrogation is governed by a different code article, that's 1829. Indeed, the comment to 3048, which Lexon relies so heavily on, it says 3048 is reproducing the substance of 1829. And all that means is that the two articles must be read together. One doesn't trump the other, they must be read together. So if you're entitled to legal subrogation, you move to 1829 and you say, okay, what does 1829 tell me about the parameters of legal subrogation? And it says, legal subrogation takes place in favor of an obligor who pays a debt with others or for others, and who has recourse against those others as a result of the payment. So to break that down, first, an obligor entitled to legal subrogation under Louisiana law must pay a debt with others or for others. Here, Lexon paid a debt for Linder. It did not pay a debt for Chevron, BP or Sojitz. That should end the inquiry. But even if you assume more broadly that Lexon paid a debt for Chevron, BP or Sojitz, who might be called upon by the government once performed, still, in order to be entitled to legal subrogation, 1829 says it must have recourse against those others as a result of the payment. Well, what does it mean to have recourse against another? It simply means that there must be some substantive legal right and in substantive legal basis outside of 1829 that would allow legal subrogation, either in contract or a statute. And Lexon has not been able to cite any authority that gives a surety to a principal obligor a right or recourse against a secondary obligor because there is no such authority. The restatement, which provides guidance to Louisiana courts, we've cited cases where Louisiana courts have looked to the restatement for guidance. It's pertinent here. And it's pertinent provision section 28 says a surety can assert the rights of the obligee, here the government, against any other secondary obligor for the same underlying obligation unless the other secondary obligor is a subsurity. And here, that's where you look to the tiered framework of both the regulations and Linder's separate contractual undertaking of those obligations where Chevron, BP, and Sojitz were analogous to subsurities with respect to Lexon. And notably, again, the district court here was not writing on a blank slate. In the tri-union cases, the court addressed the very exact same legal arguments that Lexon is making here. There, a surety for the primary obligor for offshore decommissioning also sought to enforce a subrogation claim against a former leaseholder. It was Apache in that case. First, the court rejected the surety's reliance on the federal statute 9309. It said it simply has no application with respect to a surety's rights to third parties. But then in tri-union 3, the court said it acknowledged there's a hierarchy here between the surety for the principal obligor and the former leaseholders under the regulations, and in the contracts in that case, had a similar contractual assumption. And therefore, the court said because of that hierarchy, the surety accepted the primary obligor's duty to the government, and therefore the surety, not the former leaseholders, must bear the loss. And I would point out that while the government is not a party in this case, the government was a party in tri-union. In tri-union 3, it was the government who brought a summary judgment against the surety there. The surety in that case was dilatory and would not hand over the bonds. So Apache, the former leaseholder, had to perform without the bonds in that case. The government filed a summary judgment where it said, order the surety to give us the bonds so that we can turn the money under the bonds over to the former leaseholders. And so the government's position in that case is on all fours with the former leaseholder's position here. Ultimately, it's because of that tiered hierarchy that the result is the same, no matter what law applies, Louisiana law or federal common law. Finally, the district court correctly rejected Lexon's alternative arguments under Louisiana law theories of contribution or unjust enrichment. As to contribution, it looked to Article 3055, which provides a right to contribution between co-sureties for the same obligation of the same obligor. And the district court here said, well, Chevron, BP, and Sojitz, they weren't co-sureties with Lexon. Lexon was the surety for the primary obligor, whereas Chevron, BP, and Sojitz were secondary obligors. They were independently liable to the government, but they were secondary obligors akin to subsureties. It further recognized that for to apply, Lexon would have to essentially step into the shoes of Linder. But Linder itself would have no right to contribution against Sojitz or Chevron, where Linder itself contractually agreed to do these decommissioning obligations. So the court recognized it makes no sense to allow a right of contribution where its principal wouldn't have that same right. As to unjust enrichment, the district court here said, even if there was an enrichment, it was justified. It was justified based upon the regulations and the party's contracts. I would submit to the court the district court's decision here is well-reasoned. It comports with the authorities on each and every should be affirmed here. Thank you. Thank you, Ms. Becker. You may proceed. You are muted, I believe. Got it. Good afternoon. May it please the court. I'm Leanne Schell for Sojitz this afternoon. Your honors, Sojitz is positioned the same as Chevron and BP in this instance. It too is only secondarily responsible to the government for any decommissioning obligation. And it too has contracts with Linder in which Linder released Sojitz and agreed to indemnify it for any decommissioning obligation. And those things are important because they, as Ms. Becker said, they defeat each and every argument made by Lexon. Now, Lexon has no equities in this case because as this court noted in Lexon versus FDIC, Lexon was given the opportunity and warned by the FDIC that it should protect itself and secure its bond obligation by going to another lending institution or by making claims under the letters of credit. But Lexon chose to do neither of those things. And this court noted that it had 53 days to do so, but didn't. Again, Lexon has a hand up given to it under the law. And that is what 9309 is actually intended to do. And as a priority statute, 9309 gives Lexon the ability to pursue Linder in its bankruptcy in the shoes of the United States with its priority, which under the priority statute says that Lexon is first. So it is first in line. Lexon also had a right and exercised it against the individual guarantors for the bonds. And in the same judgment that's on appeal here, Lexon was granted summary judgment against Captain Biggs and Roger Linder on their breach of contract for failing to fulfill their indemnity obligations. So it is not without any remedies. Now, with respect to SOGES, again, individually, SOGES, when the decommissioning order was issued by the government, Chevron and SOGES determined that SOGES would actually do the work. And so it did. So it did the decommissioning work to the tune of $13.6 million. That's almost $2.5 million more than what Lexon's bonds covered. So the United States has been fully satisfied. It signed off on the decommissioning work and all obligations to it are fulfilled, in part by Lexon's bonds or the price of them, but then by the work done by SOGES. So it is not in the position to be owed anything. On the topic of 9309 and Lexon's argument that that statute provides a right of action to it, Ms. Becker explained the statutory construction, but also if this court looks at the 35 notes of under 9309, it will see that interpretation of that statute going back for a hundred years to cases mostly in the 1920s and 30s show that it is what it is, a priority statute, and the shorty gets the priority of the United States. It was formally Section 193, which was closer at the time to Section 191, which was the government's priority. So there's no question when the court goes and looks at the history of the statute and what it covers, that it is in fact limited to being a priority statute. And then for all of the reasons that were stated, Louisiana law provides no avenue of relief. And again, that's primarily because of the order of responsibility. SOGES is never obligated on the same basis as LENDER, and that thwarts the subrogation theory, the contribution theory, and again, the contracts thwart the theory under unjust enrichment. And I'm sorry, I don't see a clock, Your Honor. We have two seconds. Okay, well then perfect. I thought I had the feel for it. With that, I'll just say that SOGES, like Chevron and BP, urged the court to affirm the district court. Well, I'm amazed. Didn't have a clock, but you're wrapping up right on time. Mr. Ginsburg, what do you have to say? Thank you, Your Honor. Just a, oh, I think I reserved, yeah, five. Okay. Thank you, Your Honor. Just a few points in rebuttal. The corporate defendant's arguments are premised on two defective assumptions, and you heard them here today. Namely, that the rights of the principal are the relevant yardstick here for assessing Lexon's recovery, as opposed to the rights of the obligee, the government. And then number two, in measuring the rights of the government, that there's some kind of tiered hierarchy or secondary subsurity relationship, principal obligor, secondary obligor relationship. That is not, that is completely inconsistent with the notion of joint and several responsibility, which is, to the word, what the Code of Federal Regulations prescribes for these leasing transactions. Linder and the corporate defendants shared their obligations equally, jointly and severally. So it was their obligee that they shared equally in the duty to perform in the first instance. They shared equally, the default, the non-performance upon the deadline was just as much a default of the corporate defendants as Linder. And as a result, the government on the back end was allowed to pursue the corporate defendants just as readily as it could have pursued Linder. And the question for subrogation is at the moment of default, when the government is aggrieved, what are the government's rights? What can it do? And joint and several liability, which is the framework, means that the government could have pursued any one of those parties co-equally. So when Lexon steps into the shoes of the government, upon becoming a paying surety, it can pursue any one of those parties co-equally. And that means that it can pursue the corporate defendants here straight away, just like the government could have, even though it opted not to. Now, as to the specific source of law issues that my friends on the other side discuss, the notion that federal common law writ large does not apply on the OCS, which I take to be their position, is completely contradicted by, among other things, the U.S. Supreme Court's decision in the Chevron case. There, the court, when it was confronting the issue of whether a particular federal common law remedy applied or whether a state law remedy applied to displace it, it didn't say there's no federal common law on the OCS, period, game over. It went through a relatively complicated analysis and ultimately remanded the matter to the lower court to figure out whether there was any inconsistency between the two remedies, whether it could avoid this question, et cetera. That is plainly not the opinion the would have written if federal common law was off limits. Under your reading of 30 CFR 556710, is that regulation completely superfluous? No, I don't think it's. Oh, I'm sorry. I understand the necessary sufficient thing, but I understand what you're saying. It's utterly irrelevant. Like, it can never actually apply to anybody because there's always joint and several liabilities. So, of course, the government can go after either the lessor or the predecessor, predecessors in interest. But how would the statute ever apply? I'm sorry, the regulation ever apply? Well, I don't think it absolutely binds the government's discretion because, as your honor noted, there is that regime of joint and several liability. I think the regulation is consistent, though, with the relatively informal tone of a lot of these regulations, which are written in the second person, use words like you, et cetera, which offer guidance to the government's prevailing way of thinking and the way it has done business, the way it has exercised that discretion for quite some time. It is not meaningless. It is a very important guide for what the government will do. But I agree with you. I take the joint and several liability regime as saying that the government is not absolutely bound to proceed in that order. And in fact, the government has said so in various bulletins and the like issued by DOI when it says that it can pursue any jointly and severally liable party at any time. So my second question is, while we are dealing with superfluous provisions in this record, is the provision in the lenders buyer agreement agreeing to indemnify the decommissioning obligations of the corporate defendants? Is that superfluous? No, it's absolutely not superfluous. Our argument is that it does not apply to limit the rights of Lexon because it does not bind Lexon, nor does it bind the government. Sure. Who does it bind? It binds. It's as between lender and the corporate defendants. It binds the two parties, the parties who signed the agreement. Let me ask you, let me ask it this way. Let me ask it this way. Imagine that you aren't representing Lexon. You said you're representing Chevron and you're advising your client on the hey, we're getting good value out of this indemnification. How? It doesn't actually give Chevron any peace, right? It gives it no peace as between a complete stranger. It doesn't know you at all, right? You're a complete stranger to Chevron and it gives them no peace as to the government under your theory of joint and several liability. So you negotiated it, right? They gave up other valuable cash consideration by hypothesis for it and it them zero. Yes. Well, I think what I would say to Chevron, your honor, in response to your question of how I would counsel the client, the hypothetical client is that all of this, these arrangements are enact are formed against the backdrop of, of a rich pedigree of surety ship law under which sureties have the right to sureties are subrogated to the rights of the including as against third parties. And if you want to protect yourself and contractual arrangements that don't bind the surety or the obligee do not limit those rights. So if you hypothetical client want to protect yourself further than what the current legal regime allows, you can get some sort of insurance or surety ship or a relate arrangement yourself. And in fact, that's often done in the industry, but in all events, it does not negate the fundamental notion of joint and several liability. I think I would also advise the client consistent with my response earlier to your question that look, the government has proceeded in this, uh, orderly way, uh, for a while now. And there are regulations that say that, that sometimes if the government is thinking about changing it and they ask for comments, et cetera, but strictly speaking, you should be aware that joint and several liability means joint and several liability. Um, and you should be ready for those consequences. If I could just have one more minute, um, uh, to wrap up on, uh, the sources of law issue with the court's indulgence, uh, once you have given one minute, so we'll know when it expires. Thank you, your honor. Um, I think we discussed a federal common law, how the Chevron case would come out differently, uh, on Louisiana law, my friend's primary arguments as I understand them, uh, are to resort to the caption, not only of the, not simply of the section, but of the chapter in which a 3048 is contained as well as a code comment. Neither of those things are the law. Uh, this court has always interpreted text first and it should do that here. Uh, and article 3048 by its text authorizes subrogation here and it's completely consistent with 1829 because 1829, uh, enumerates types of parties in whose favor subrogation can occur. It does not purport to it to discuss the extent of that subrogation. That's what 3048 does in the particular context of surety ship at issue here. So if there are no further questions, I'd ask that the decision below be reversed and judgment entered for Lex on. Thank you, your honors. All right. Thanks to all three of you for helping us understand this case. Uh, we are in recess. Thank you. Thank you.